## AFFIDAVIT OF PROBABLE CAUSE
## IN SUPPORT OF RESTRAINING ORDER

I, Daniel M. Sirmons, Special Agent for the United States Federal Bureau of Investigation, being duly sworn, depose and says:

### INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been employed in this capacity since February of 1995. I am currently assigned to the FBI Tampa Field Office in Tampa, Florida. I earned a Bachelor of Science in Electrical Engineering from the University of South Florida in 1988. I have attended over 500 hours of training in various aspects of criminal investigations and cyber-related technical training. In my capacity as a Special Agent with the FBI, I have conducted investigations into both criminal and national security matters, focusing on violent crime, narcotics, counterterrorism, counterintelligence, computer intrusions, and cybercrimes to include those involving cryptocurrency to facilitate wire fraud, computer fraud, mail fraud, and money laundering. I have also assisted in the execution of numerous search warrants, resulting in the seizure of paper, electronic, and other forms of evidence.

2. As a Special Agent with the FBI, I have received significant training on how people use computers to commit crimes and the law enforcement techniques that can be utilized to investigate and disrupt such activity. I have also been involved in, among other things, online and in-person undercover operations, as well as controlled drug deliveries and transactions. Moreover, in the course of my

investigations and other cases on which I have worked, I have gained experience executing search warrants for physical premises, as well as for electronic evidence, such as the content and other data associated with email, messenger, financial, and digital-marketplace accounts operating on both the traditional Internet and the dark web.

3. This affidavit is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement personnel, and my training and experience concerning the use of computers in criminal activity and the forensic analysis of electronically stored information. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## **PURPOSE OF AFFIDAVIT**

4. This affidavit is submitted in support of the United States' application for a restraining order, brought pursuant to 21 U.S.C. § 853(e)(1)(A), as incorporated under the provisions of 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1), for the assets listed below (collectively, the Subject Assets"):

    a. Approximately 719.99591411 BTC seized from the defendant's Bitcoin Wallet 3Pxki6pFFKC12YSn8JtDs3ZrEg3pFTHnHd on or about January 27, 2021;

2

    b.    Approximately 15.725489349111 XMR seized from the defendant's Monero Wallet 46rzcLXcqE2hL9KYmJ5vuQVXHhhR7jDXxj4nKzwjDMeFf7KhtTbmK6oHTbQ53jzuZfMrMwvbK8ztidbqwTuxNTVaAQYKBfY on or about January 27, 2021;

    c.    Approximately $299,150 CAD seized from the defendant's residence on or about January 27, 2021;

    d.    Approximately $238,620 CAD seized on or about January 28, 2021, from Safety Deposit Box #118 at National Bank, Gatineau, QC, held in the name of Sebastien Vachon-Desjardins; and

    e.    Approximately $98,070 CAD seized on or about January 28, 2021, from Safety Deposit Box #123 at National Bank of Canada, Gatineau, QC, held in the name of Sebastien Vachon-Desjardins.

5.    As set forth below, I submit that there is probable cause to believe that the Subject Assets are property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of violations of 18 U.S.C. §§ 1343 and 1349, and are, therefore, subject to forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Additionally, I submit that there is probable cause to believe that the Subject Assets are property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of violations of 18 U.S.C. §§ 371 and 1030, and are, therefore, subject to criminal forfeiture pursuant to 18 U.S.C. § 982(a)(2)(B).

3

## BACKGROUND ON CRYPTOCURRENCY

6.      Bitcoin[1] is a type of virtual currency, circulated over the Internet. Bitcoin are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network.

7.      Bitcoin can be exchanged directly, person to person, through a cryptocurrency exchange, or through other intermediaries. Bitcoin are sent and received from Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled through the use of a unique corresponding private key. This key is the cryptographic equivalent of a password, or pin, and is necessary to access the Bitcoin address. Only the holder of an address's private key can authorize any transfers of bitcoin from that address to other Bitcoin addresses. The individual or entity who holds the private key for a Bitcoin address is therefore considered the "owner" of the address. Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin address for each and every transaction. Users often combine multiple Bitcoin addresses (and their corresponding private keys) in a single logical unit known as a Bitcoin "wallet."

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

8. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is often used by individuals and organizations for criminal purposes, such as money laundering. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track proceeds of illicit activities. Although it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

9. While a Bitcoin address itself does not generally reveal the address's owner (unless the owner opts to make information about the owner's Bitcoin address publicly available), the Bitcoin blockchain is an open, distributed ledger that records transactions of bitcoin between two addresses efficiently and in a verifiable and permanent way. Investigators can sometimes use the blockchain to identify the owner of a particular Bitcoin address or identify Bitcoin addresses that likely all belong to the same owner. For example, because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to other Bitcoin addresses, including Bitcoin exchanges and Bitcoin payment processors.

## STATEMENT OF PROBABLE CAUSE

10. Ransomware is a type of malware that is used to compromise and restrict access to a victim's computer network in an effort to extract a ransom. From in or around August 2019, and continuing until in or around January 2021, victims

5

around the world, including within the Middle District of Florida, were victimized by a ransomware variant named "NetWalker." The NetWalker Ransomware was deployed on approximately 400 victims, including municipalities, hospitals, law enforcement and emergency services, school districts, colleges, and universities. It specifically targeted the healthcare sector during the COVID-19 pandemic, leveraging the global crisis to exert additional pressure on victims to pay. NetWalker was used not only to encrypt victim data, but it was also used to steal victim data. If a victim did not pay the ransom, the stolen data was often published online. To date, NetWalker attacks have resulted in the payment of tens of millions of dollars in ransoms.

11. Beginning in or around March 2020, NetWalker began to be advertised as ransomware-as-a-service ("RaaS"), featuring developers and affiliates (collectively, the "NetWalker Actors"). Under this model, developers were typically responsible for creating and updating the ransomware and making it available to affiliates. Affiliates were usually responsible for identifying and attacking high-value victims with the ransomware. After a victim paid, developers and affiliates generally split the ransom.

12. Based on the investigation, I am aware that the NetWalker Actors commonly gained unauthorized access to a victim's computer network days, weeks, or even months prior to the demand for ransom. During this time, the affiliate surreptitiously elevated his/her privileges within the network while spreading the

6

ransomware from workstation to workstation. Further, I have learned that a victim company generally learned that its computer network has been compromised and its data encrypted via the delivery of a ransom note in the form of a file.

13. The ransom notes provided the victim with a unique code and the URL to a website hosted on the dark web ("NetWalker Tor Panel").[2] In order to gain access to the NetWalker Tor Panel, the victim had to enter the unique code. After gaining entry, the victim was provided with the amount of ransom demanded (in Bitcoin), and instructions for payment. The victim could also communicate directly with the NetWalker Actors on the NetWalker Tor Panel via a chat function.

14. Since at least in or around May 2020, and continuing until in or about January 2021, a website named "the NetWalker Blog" existed on Tor for the exclusive purpose of facilitating the publication of stolen victim data. At times, the NetWalker Blog provided links to cloud storage and file hosting services where the stolen data had been uploaded. The NetWalker Blog listed the victim company, a summary of the company's services, and either a link to the stolen data or when it would be published. The NetWalker Blog also posted links to screenshots of data stolen from victims, in an apparent attempt to prove that the sensitive data had in fact been stolen.

---

[2] The Onion Router ("Tor") is a network of computers distributed around the world designed to conceal the true IP addresses of the network's users. The Tor network also enables websites to operate in a manner that conceals the true IP address of the server hosting the website.

15. On or about April 15, 2020, an FBI Online Covert Employee ("OCE") accessed the NetWalker Tor Panel. While there, the OCE was able to observe the website's index page entity tag and the date that the index page had last been modified.[3] Investigators then used two independent commercial tools that scan the internet and collect information about internet-connected computers, including entity tags. After querying the entity tag and date modified, both commercial tools returned only IP address 79.124.62.6, which resolved to a provider in Isperih, Bulgaria ("the Bulgaria Server"). On or about September 21, 2020, and again on or about January 27, 2021, investigators received data from the Bulgaria Server from Bulgarian authorities. Based on the forensic analysis conducted by an FBI Computer Scientist, the Bulgaria Server appears to operate as the backend, or internal-facing, server of the NetWalker Tor Panel and the NetWalker Blog.

16. The Bulgaria Server contained detailed transactional information as to each affiliate. The transactional records revealed that from on or about February 29, 2020, to on or about January 27, 2021, approximately 100 affiliates had been active, and victims had paid approximately 5,058 bitcoin in ransoms, which is the equivalent of more than 200 million dollars as of the date of this affidavit. Affiliate "User ID 128" had been active since April 13, 2020, and ranked first among affiliates

---

[3] An entity tag helps a browser determine if it can retrieve the requested resource from local cache or if it must be retrieved from the server. This helps improve loading times since if the resource can be retrieved from local cache, the browser does not need to make an additional request to the server. Generally, entity tags are unique identifiers.

8

in amount of bitcoin received in ransoms, collecting 1,592 bitcoin, which is the equivalent of more than 60 million dollars as of the date of this affidavit.

17. Investigators subsequently identified Sebastien Vachon-Desjardins ("VACHON")—a Canadian citizen residing in Gatineau, Quebec, and former employee of the Canadian Government—as "User ID 128." On December 2, 2020, a federal grand jury returned a four-count indictment charging VACHON with conspiracy to commit computer fraud, conspiracy to commit wire fraud, intentional damage to a protected computer, and transmitting a demand in relation to damaging a protected computer. At the request of U.S. authorities, the Royal Canadian Mounted Police ("RCMP") provisionally arrested VACHON in Gatineau, Quebec on January 27, 2021. VACHON is presently pending extradition to the U.S.

18. At the time of VACHON's arrest, the RCMP seized the Subject Assets pursuant to search warrants authorized by the Ontario Court of Justice. As discussed herein, investigators have identified VACHON as the NetWalker affiliate who operated under "User ID 128." From April 13, 2020, until January 27, 2021, victims paid at least 1,592 bitcoin (a current value of more than U.S. $65 million) in ransoms as a result of VACHON's ransomware attacks, all of which are subject to forfeiture under U.S. law. The Subject Assets represent only a fraction of this total amount. Furthermore, VACHON's prior, legitimate employment with the Canadian Government neither paid his wages in cryptocurrency nor was sufficient to generate the wealth that the Subject Assets represent. Accordingly, I believe the Subject Assets

9

constitute property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the charged violations, and are property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the charged violations.

Further affiant sayeth naught.

_Daniel M. Sirmons_
DANIEL M. SIRMONS
Special Agent
Federal Bureau of Investigation

COUNTY OF Hillsborough

STATE OF Florida

Sworn to (or affirmed) and subscribed before me by means of __X__ physical presence or _____ online notarization, this __11th__ day of __January__, 2022, by Daniel M. Sirmons, Special Agent, Federal Bureau of Investigation.

ISIS J. CHRISTY
Notary Public - State of Florida
Commission # GG 294774
My Comm. Expires Jan 24, 2023
Bonded through National Notary Assn.

_Isis J. Christy_
(Signature of Notary Public)

_Isis J. Christy_
(Name of Notary Typed, Printed, or Stamped)

SEAL

Personally Known __X__ OR Produced Identification _____
Type of Identification Produced_____